FILED_____ ENTERED
_____ LOGGED_____ RECEIVED

SEP 19 2018

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF THREE APPLE IPHONES LOCATED AT 31 HOPKINS PLAZA, 6TH FLOOR, BALTIMORE, MARYLAND 21202** | Case No. ___18 - 2 4 4 5 **BPG**___ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER
## RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, James J. Jenkins, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      Your affiant makes this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a search warrant authorizing the examination of

property—electronic devices—that are currently in law enforcement possession, and the

extraction from that property of electronically stored information described in Attachment B.

2.      Your affiant is a Special Agent with the U.S. Department of State, Diplomatic

Security Service (DSS), and has been employed by the Department of State since September

2011. Your affiant is currently assigned to Homeland Security Investigations' (HSI) Document

and Benefit Fraud Task Force in Baltimore, MD.  This task force investigates frauds related to

documents, identities, and immigration benefits.  Your affiant is empowered under 22 U.S.C. §

2709 to apply for and serve federal arrest and search warrants.

3.      The facts set forth in this affidavit are known to me as a result of my participation

in this investigation, from information provided to me by other law enforcement officers and

government officials, and from documents, records, and other evidence obtained during this

investigation. Since this affidavit is intended to show merely that there is sufficient probable

cause for the requested warrant, it does not set forth all of my knowledge about this matter.  Your

affiant set forth only the facts that I believe are sufficient to establish probable cause that



violations of 18 U.SC. §§ 371, 1512, 1519, 1546; and 8 U.S.C. § 1324, 1324a (collectively referred to as the "Target Offenses"). References to dates, times, and amounts are intended to be approximate. All translation from Hebrew or French to English was done using Google Translate unless otherwise noted. Everything set forth in this affidavit is true to the best of my knowledge and belief.

### IDENTIFICATION OF THE TARGET DEVICES TO BE EXAMINED

4.      The property to be searched are:

    a.  An Apple iPhone 7, model A1778, International Mobile Equipment Identity ("IMEI") 353841087910253;

    b.  An Apple iPhone 6, model A1549, IMEI 355791070629055; and

    c.  An Apple iPhone 7 Plus, model A1784, IMEI 356572082018670.

Collectively these are referred to herein as the "Target Devices." The Target Devices are currently located at HSI Baltimore, 31 Hopkins Plaza, 6th Floor, Baltimore, Maryland.

5.      The applied-for warrant would authorize the forensic examination of the Target Devices for the purpose of identifying electronically stored data particularly described in Attachment B. As set forth more herein, your affiant has obtained significant electronic evidence through prior search warrants, and has probable cause to believe that the cell phones listed above contain evidence of incriminating WhatsApp communications and other electronic messages between the subjects of investigation relating to federal crimes.

### PROBABLE CAUSE

#### Summary Of Investigation

6.      For more than one year, the Department of State Diplomatic Security Service ("DSS"), Homeland Security Investigations ("HSI"), and the U.S. Department of Labor – Office of Inspector General, Office of Investigations – Labor Racketeering and Fraud ("OILRF") have



been investigating **Asher SHARVIT ("A. SHARVIT"), Rona ZHFANI ("ZHFANI"),** and

**Oren Sharvit ("O. SHARVIT")** (collectively referred to as the "Defendants"), and other co-

conspirators. Your affiant and other federal agents have obtained information from subpoenas,

searches pursuant to the border inspection authority of the Department of Homeland Security

(DHS), government records, search warrants, consent searches, interviews, surveillance, and

other investigative means.

7.      Based on the investigation to date, your affiant and other federal agents have

obtained evidence that at various times during the period in or about 2012 to in or about 2017, **A.**

**SHARVIT, O. SHARVIT,** and **ZHFANI** have owned, controlled, operated, worked for, and/or

otherwise been affiliated with the following entities: Unlimited Treasures, Inc., Unlimited 13

Corp., Deja Vu Cosmetics, and others (collectively "Unlimited" or "Defendants' Companies.").[1]

The Defendants' Companies leased or operated kiosks and stores in New York, Virginia,

Maryland, and Delaware. The Defendants' Companies often used the trade names Deja Vu and

BioXage.

8.      Your affiant submits that the evidence set forth herein shows that the Defendants

and their co-conspirators (1) recruited foreign citizens to travel to the United States and work as

employees in the Defendants' Companies; (2) caused foreign citizens to apply for B1/B2 visitor

visas and/or visa extensions,[2] which did not permit employment in the United States; (3) paid

---

[1]      According to Maryland Department of Assessments and Taxation records, as of April
2010, **A. SHARVIT** was the registered agent for Unlimited Treasures and co-conspirator #4 was
the registered agent of Unlimited 13 Corp, as of June 2015. Deja Vu Cosmetics is company that
was based in Israel and Pennsylvania—co-conspirator #1 operated the Pennsylvania portion.

[2]      Individuals receiving B1/B2 visitor visas are supposed to be entering the United States
for tourist and/or business purposes. While a visitor admitted in B1 status would be allowed to



foreign citizens in cash without reporting their employment to federal or state authorities, nor making proper payroll deductions; and (4) provided foreign citizens with travel reimbursements, and arranged their transportation and lodging in the United States, which facilitated the Defendants' illegal use of foreign workers. The foreign workers were only paid on a commission basis, and the company paid no payroll taxes. Your affiant submits that this suggests that an object of the conspiracy was to increase the financial profits of Unlimited and the Defendants and co-conspirators controlling Unlimited.

9.      On or about June 25, 2018, this Court issued criminal complaints against the Defendants, finding that there was probable cause to believe that they had conspired to defraud the United States, in violation of 18 U.S.C. § 371.

10.     On or about June 27, 2018, the Defendants were arrested as they entered the United States from Israel.

11.     On or about June 27, 2018, the Target Devices were seized from the Defendants by DHS law enforcement officers pursuant to the Border Search authority of the Department of Homeland Security.[3]

12.     After she was arrested on June 27, 2018, **ZHFANI** told federal agents that she had helped out but had not worked at Unlimited; that **A. SHARVIT** sold his company a long,

---

conduct business activities such as attending conferences, negotiating contracts, or consulting business associates, neither B1 nor B2 status confers authorization to work in the United States. At a Port of Entry, depending on their purpose of travel a foreign citizen is often admitted to the United States in either B1 (business) or B2 (tourist visitor) status.

[3] Based on information obtained from HSI, your affiant learned that the device in paragraph 4a was seized from **A. SHARVIT**, the device in paragraph 4b was seized from **O. SHARVIT**, and the device in paragraph 4c was seized from **ZHFANI**.



long time ago, and that co-conspirator #4 was the person to whom the business was sold.
**ZHFANI** also claimed that maybe someone else used her phone to send WhatsApp messages.

13.     On or about July 10, 2018, the grand jury returned an Indictment against the
Defendants, charging them multiple criminal offenses, in violation of 18 U.SC. §§ 371, 1546(a);
and 8 U.S.C. §§ 1324(a)(1)(A)(iv), 1324(a)(3), 1324(a)(1)(iii).[4]

14.     On or about August 21, 2018, the grand jury returned a Superseding Indictment,
which added obstruction of justice charges against **A. SHARVIT** and **O. SHARVIT**, in
violation of 18 U.S.C. §§ 1512, 1519.  As part of the investigation, federal agents have
uncovered evidence that in or about February 2017, the **A. SHARVIT, O. SHARVIT** and some
of their co-conspirators caused and/or aided and abetted the destruction of documents, records,
and tangible objects containing evidence of the crimes described herein, and corruptly persuaded
others to destroy documents and records.  Your affiant has also uncovered electronic evidence to
support the obstruction of justice charges, including a voicemail left for co-conspirator #1 and a
receipt for shredding services sent to **A. SHARVIT** and co-conspirator #1 via WhatsApp.

**Prior Search Warrants**

15.     Federal agents have previously sought and obtained search warrants for email
accounts associated with the crimes under investigation as well as an iPhone 7 seized on or about
July 27, 2017, from co-conspirator #1.  *See* 17-2555-JMC (Sept. 19, 2017); 18-458-JMC (Feb.
23, 2018).  As detailed further herein, the electronic evidence to date has yielded

---

[4]     Mordehay (aka Moti) FOOX, Eyal CHERTOFF and Esti MAZOR are also associated
with Unlimited.



extensive evidence about the conduct of the scheme, including voluminous WhatsApp[4] messages.

16.     As a result of the investigation to date, including the electronic evidence, as well as interviews of Unlimited employees, your affiant has evidence that the Defendants and their co-conspirators used electronic messages to discuss the conspiracy and details related to recruiting, hiring, scheduling, paying, and housing foreign citizens. In particular, the WhatsApp messages make plain that the Defendants knowingly used foreign citizens as employees and sought to circumvent the immigration and employment laws of the United States.

17.     On June 26, 2018, U.S. Magistrate Judge Kevin Fox (SDNY), authorized a search warrant for the residence of **A. SHARVIT** and **ZHFANI** in New York, NY. During the search, agents located numerous electronic items including laptop computers and cellular phones, which are still being analyzed. Among other items, agents also located a notebook in the residence that contained handwritten names of malls and first names that appeared to be schedules and what appear to be agenda notes for a meeting with employees

**The Defendants' Companies Had Foreign Citizens Working At Malls And Other Retail Locations Ranging From Washington, D.C. Area To The New York Metropolitan Area**

---

[4]     WhatsApp is a messaging application that can be used on mobile phones. WhatsApp allows for voice calls and exchanging text messages including in a group with multiple recipients. The Defendants, along with other co-conspirators, were members of a WhatsApp message group titled "management." This group included "Asher," "אורן", "רונה", and the first names of co-conspirators #1, 2, and 3. A native Hebrew speaker reviewed the names רונה and אורן and your affiant learned that they translate to "Rona" and "Oren." Your affiant believes Asher refers to **A. SHARVIT**, Rona refers to **ZHFANI**, and Oren refers to **O. SHARVIT** and WhatsApp messages from these names are so attributed in this affidavit.



18. The federal investigation has revealed that the Defendants' Companies primarily leased retail space at shopping malls in Maryland and Delaware. Agents have spoken with multiple representatives at shopping malls in Maryland and Delaware. From these interviews and records obtained, agents know that the business locations were often leased using the business entities Unlimited or Deja Vu Cosmetics. The stores often identified themselves to the public under the names Deja Vu Cosmetics and BioXage. Certain members of the conspiracy, including **A. SHARVIT**, were also affiliated with another venture called Filicori Zecchini.[5] Your affiant has obtained copies of leases with malls, which reflect that co-conspirators #1, #3, and #4 were signatories for Unlimited related leases.[6]

19. Based on a WhatsApp message that **A. SHARVIT** sent on or about December 30, 2015, your affiant submits that **A. SHARVIT** had broad managerial responsibilities and that the scope of the conspiracy's operations was quite broad. In the WhatsApp message, **A. SHARVIT** provided an update on the leases of the conspiracy at various locations, writing:

> "Ok Guy's so!!!
> We will have 33 people left+Tami and israel+maya and you too!!;)
> So 37+2 that needs to arrive.
> We will keep:
> *Mills1+2(Lease signed)
> *Fsk mall(lease signed)

---

[5] **A. SHARVIT** and other members of the conspiracy are/were involved in operating multiple retail coffee shops called Filicori Zecchini. The coffee shops are located in New York and Maryland. Federal agents have identified multiple current or former employees of Maryland-based Filicori Zecchini locations who are/were in the United States on visitor visas or on a visa waiver (which also prohibits employment). **A. SHARVIT** and others are believed to be investors in Filicori Zecchini locations.

[6] This affidavit references co-conspirator #1, co-conspirator #2, co-conspirator #3, and co-conspirator #4. None of those four individuals are the named Defendants herein.



\*Valley(lease signed)
\*Towson(lease signed)
\*Wheaton mal(signed)
\*christianna(signed)
\*Towson store(signed)
\*Christianna store (signed)
\*Roosevelt store(signed)
\*Whitemarch(moti)
\*Harford(jean mi please sign for one month at the rate we pay and tell her we might renew)
\*Pg Plazza(Please renew for one month and tell her at this rate we can not stay more for the moment)

Locations to close tommorow night:(5,jean mi please organize closings properly and make sure all products will be reused for the other locations)

Valley 2
Pg 2
Francey 2
Springfield
Annapolis
Mills 3

Yallaaaaa guy's we start the year with 13 locations!!!;)
Woujouuuuuuu!!!!!!!!!!!!"[7]

---

[7]     Based on context, geography, and information gathered during the investigation, your affiant believes "Mills" referred to Arundel Mills Mall, "Fsk mall" referred to Francis Scott Key Mall, "Valley" referred to Valley Mall, "Towson" referred to Towson Town Center, "Wheaton" referred to Westfield Wheaton, "Christianna [sic]" referred to Christiana Mall, "Roosevelt store" referred to a store operated in the Roosevelt Hotel in New York, "Whitemarch [sic]" referred to White Marsh Mall, "Harford" referred to Harford Mall, "Pg Plazza [sic]" referred to The Mall at Prince Georges, "Springfield" referred to Springfield Town Center, and "Annapolis" referred to Westfield Annapolis.



20.     On or about December 20, 2015, **A. SHARVIT** was sent an e-mail entitled "List of Employees + Malls + Apartments." The e-mail included a spreadsheet attachment entitled "Employees list DEC 2015.xlsx." The "employees" tab contained the names of **O. SHARVIT** and **ZHFANI** as well as 50 first and last names and one first name. Hereinafter, those employees are identified by their initials (as are other individuals believed to be employees of the Defendants' Companies).

21.     The employee list did not contain dates of birth, thus making it difficult to identify and cross-reference employees to immigration records with certainty. Using other records and information obtained during this investigation, your affiant has been able to identify 10 employees on the list (O.P., S.Y., L.C., Y.E., E.S., M.G., R.Z., A.D., L.B.M., and A.A.) as foreign citizens present in the United States without work authorization. Your affiant has also been able to identify two employees, M.B. and H.C., as having legal authorization to work in the United States. Your affiant submits that based on the investigation and information detailed herein that there is probable cause to believe that the majority of these 51 employees lacked authorization to work in the United States and were therefore illegally employed.

22.     On or about the same day, December 20, 2015, **A. SHARVIT** sent a WhatsApp message to the other Defendants and co-conspirators, which included the names of Mall locations, such as "Towson" or Pg Plazza" as well as hours, such as "(7h00 am-10h00pm)" or "(6h30-11hpm)." Under each location, **A. SHARVIT** listed certain Unlimited employees, typically using just their first names. Many of these first names match the full employee names emailed to **A. SHARVIT** on or about December 20, 2015.

**Foreign Workers Were Recruited And Employed As Part Of The Conspiracy**



23.     Through records and interviews, your affiant and other federal agents have

identified more than 40 foreign citizens who are believed to currently work or have worked at the

Defendants' Companies and/or Filicori Zecchini.  Based on information gathered, it appears that

most Unlimited employees were foreign citizens and the majority of the foreign citizens entered

the United States on visitor visas or under visa waivers.  Your affiant and other federal agents

have uncovered electronic evidence as well as information from other sources that has revealed

that the Defendants and their co-conspirators actively sought out foreign citizens to work at

Unlimited.  In particular, your affiant and other federal agents have reviewed messages in either

WhatsApp and/or emails in which **A. SHARVIT** and others communicated about the

recruitment, transportation, and visa statuses of foreign citizens.

24.     For example, your affiant located an email forwarded to co-conspirator #1 in or

about April 2015. The email appears to have been initially sent by **A. SHARVIT** in which he

wrote: "I was thinking yesterday of where we are standing and where we need to go...Also I

wrote a plan that will direct us for the near future."  Attached to the email was a Microsoft Word

document that significantly included the following points:

- "*The business is growing by: 1. Bring new employees by opening an efficient
  manpower office in Israel:
  Goals: bring as many employees as we can from Israel for our retail companies
  but also in the near future by selling them to other retail companies that will sell
  our products;" and
- "2. keep working with creation[8] and maybe start to work with another man power
  Israeli company."

---

[8]     Your affiant believes "creation" is a reference to the recruiting company used by the
Defendants to locate potential workers in Israel.



25.     Several WhatsApp messages were similarly revealing.  On or about June 1, 2015, co-conspirator #2 sent a WhatsApp message to the Defendants and other co-conspirators.  The message contained an employment contract, which was signed by co-conspirator #2, and written in Hebrew with the title "Unlimited."

26.     A Hebrew speaker working at the U.S. Consulate in Tel Aviv translated the employment contract.  According to the translation, Unlimited employees were:  (i) required to work 5 ½ days per week; (ii) paid every two weeks based solely on their sales (a commission of 25-30%); (iii) provided with local travel arrangements upon their arrival at an airport in the United States; (iv) offered a 50% reimbursement of their airplane travel costs if they worked for Unlimited for three months and a complete reimbursement if they worked for six months; (v) offered advanced sales training at Unlimited's office; (vi) provided with shared housing that included the first month free, and a weekly rent of $135 thereafter; and (vii) offered access to vehicles for getting to work and/or use during their days off.

27.     The name and Israeli identification number of O.P. are listed in the employment contract.[9]  Your affiant learned from U.S. government records that O.P. entered the United States on or about June 10, 2015 as a B-2 visitor, who was not authorized to work in the United States. While in the United States, O.P. applied to extend his period of admission. He subsequently departed on or about January 12, 2016. On or about September 21, 2016, co-conspirator #2 sent WhatsApp messages (which your affiant used Google to translate) to the Defendants and other

---

[9]     Your affiant submits that the June 1, 2015 WhatsApp message and attached document demonstrate probable cause to believe that the foreign citizen entering into this agreement actually worked for Unlimited.



co-conspirators with a photograph of the boarding pass of O.P. and said that he would contact

two co-conspirators for pick-up in Baltimore. The next day, O.P. re-entered the United States and

was admitted on B-2 status.

28.     On or about September 17, 2015, **A. SHARVIT** sent a WhatsApp message to

other Defendants and co-conspirators containing the travel itinerary of S.Y.  **A. SHARVIT** then

sent instructions (which your affiant used Google to translate) to obtain a train ticket for S.Y. to

travel from New York to Baltimore and asked that the ticket be sent to co-conspirator #2.  On or

about September 18, 2015, S.Y. entered the United States and was admitted on a B-2 visa as a

visitor.[10]

**Defendants' Companies Obtained Housing For Foreign Employees**

29.     Unlimited obtained housing for the foreign employees. Agents have identified

Fallstaff Manor Apartments in the Pikesville area of Baltimore City ("Fallstaff") as a location

where many foreign citizens who worked for Unlimited lived.[11]  Based on the investigation to

date, the Unlimited employees' housing at Fallstaff was arranged by upper-level members of the

conspiracy.  Agents interviewed a Fallstaff representative who said that between February 2013

and March 2017, **A. SHARVIT** and a co-conspirator rented approximately 13 different

---

[10]     S.Y. subsequently sought an extension of her visitor visa, using a money order that your
affiant has linked to Unlimited.

[11]     Your affiant also learned through records and information from a co-conspirator that
Unlimited also housed workers at 3505 Clarks Lane, Baltimore, MD. According to Maryland
property records, this property is owned in the name of 3505 Clarks Ln LLC. According to
organization records from the State of Maryland, **A. SHARVIT**, was listed as an "authorized
person" on the initial articles of organization for 3505 Clarks Ln LLC, though he has since been
removed.



apartments. The Fallstaff representative advised that he/she believed the apartments were used to house employees of Unlimited Treasures.

30.     Agents obtained leases and applications from Fallstaff Manor Apartments and found that there were approximately 13 apartments associated with Unlimited Treasures. **A. SHARVIT** signed several of the apartment leases.

## The Defendants Conspired To Assist Employees In Filing Fraudulent Visa Extensions

31.     The federal investigation, as detailed herein, has revealed that the Defendants sought to influence and persuade foreign citizens to fraudulently enter the United States on visitor visas, and/or to file B-1/B-2 visa extensions with U.S. Citizenship and Immigration Services ("USCIS") that contained fraudulent information.  In many cases, the Defendants' Companies paid fees to the immigration attorney who handled the visa extensions and later deducted the cost from employees' wages.  The Unlimited employees would submit certain documents in their extension applications, including a Form I-539 (Application to Extend/Change Nonimmigrant Status) and supporting documentation. The Form I-539 contained the following question: "Have you, or any other person included in this application, been employed in the United States since last admitted or granted an extension or change of status?" The investigation has revealed numerous Unlimited employees who applied for visa extensions and fraudulently answered no on their Form I-539.

32.     Your affiant has been able to link a number of I-539 filings to the Defendants' conspiracy through either the address used on the form and/or through photocopies of money orders submitted as supporting documents to show that the applicant had access to funds to pay for their extended stay in the U.S.

13



33.     Your affiant reviewed multiple I-539s filed by foreign citizens linked to Unlimited.  Summary details of the applications are listed below.  The applicants listed below listed Unlimited associated apartments as their address and/or used money orders linked to the conspiracy:

| Name | Date signed | Linked address | Linked money order |
|------|-------------|----------------|--------------------|
| R.Z. | 07/08/2013 | Yes | No |
| M.C. | 10/10/2014 | Yes | Yes |
| E.S.#2[12] | 12/19/2014 | Yes | Yes |
| L.C. | 10/12/2015 | Provided an address used by Defendants' Companies on other documents | No |
| E.S. | 11/23/2015 | No | Yes |
| Y.A. | 12/22/2015 | Yes | Yes |
| M.G. | 1/7/2016 | No | Yes |
| S.Y. | 3/15/2016 | No | Yes |
| L.C. | 5/24/2016 (second application) | Provided an address used by Defendants' Companies on other documents | Yes |
| Y.E. | 5/24/2016 | Provided an address used by Defendants' Companies on other documents | No |
| L.B.M. | 6/3/2016 | Yes | No |
| Y.B. | 6/3/2016 | Provided an address used by Defendants' Companies on other documents | Yes |

---

[12] Numbers after an individual's initials are to indicate they are a different person than the one previously identified herein with the same initials.



| D.S. | 11/09/2016 | No | Yes |
|------|------------|-----|-----|
| A.B. | 11/15/2016 | No | Yes |
| N.B.A. | 12/1/2016 | No | Yes |
| A.A.#2 | 12/20/2016 | No | Yes |
| M.G.#2 | Undated, received by USCIS in 2016 | No | Yes |

34.     Your affiant located messages indicating that the Defendants were aware of employees filing visa extensions and, in some cases, **A. SHARVIT** directed a co-conspirator to assist employees in the extension filings.

35.     On or about April 11, 2016, **ZHFANI** sent a WhatsApp message to the Defendants and co-conspirators in Hebrew. Using Google Translate your affiant found that it said "! I made a call to [First name of L.C.] and he starts working on extending the visa he will stay here." Your affiant believes that this likely refers L.C. and his preparation to file a Form I-539.

36.     On or about September 22, 2016, **A. SHARVIT** sent a WhatsApp group message in English to the other Defendants and co-conspirators, including **O. SHARVIT** and **ZHFANI**, directing co-conspirator #3 to make sure visa extensions were done at least a week before they were due and to make sure they were completed.

**Each Of The Defendants Knowingly Joined The Conspiracy**

37.     The federal investigation has revealed that **A. SHARVIT** is one of the most senior members of the conspiracy.  As detailed herein, **A. SHARVIT** was a manager of a wide-ranging conspiracy involving more than 50 individuals.  The conspiracy recruited, hired, and paid foreign citizens as employees while knowing that many of the employees were present in



the U.S. on visas that did not permit employment and in some cases, as detailed herein, facilitating or encouraging the employees to obtain visa extensions to remain in the United States in an immigration status that did not permit employment.

38.     The investigation has revealed that the Defendants took actions consistent with employer-employee or manager-employee relationships. These behaviors included assigning employees to work locations, approving requests for leave, firing employees, and paying employees.  In reviewing WhatsApp messages associated with this investigation, your affiant also located messages sent by **ZHFANI** and **O. SHARVIT** that appeared to be daily work assignments. These messages appear consistent with individuals exercising mid-level supervisory authority.

39.     On or about December 22, 2015, **A. SHARVIT** sent a message in English to other Defendants and co-conspirators stating "[First name of M.S.] is going to get fired tonight,[first name of co-conspirator #3] please prepare her paycheck." Your affiant believes that the first name refers to M.S. According to U.S. government records, M.S. was present in the United States on M-1 (non-academic vocational training) visa status.

40.     Your affiant discovered videos in the WhatsApp program on co-conspirators #1's phone that appear to depict work parties and/or meetings attended by Unlimited employees. These parties/meetings appear to have been designed to motivate and encourage the employees. During one video, **A. SHARVIT** and **O. SHARVIT** are featured prominently leading the group in song and celebration.  Based on information provided to your affiant, it is your affiant's understanding that employees were paid at group meetings similar to these.

41.     Your affiant has identified multiple WhatsApp messages that were sent or received by **A. SHARVIT, O. SHARVIT, ZHFANI**, and other members of the conspiracy that



listed employees' first names, and appeared to list the amounts that they were to be paid for a particular pay period. Some messages specifically indicated they were "paychecks." Nevertheless, the investigation to date has revealed that most of the employees were not paid by checks from a bank or payroll company, but instead paid by cash, and without any required withholding under state and federal laws.

42.     Your affiant found a message exchange in the WhatsApp message group used by the Defendants and other co-conspirators in which **O. SHARVIT** and a co-conspirator discussed not having enough cash to pay the "paycheck" of two employees and referenced having to wait for the envelopes to come back. Based on the investigation, your affiant believes these envelopes contained the cash from each retail locations' sales. Moreover, your affiant has not seen check disbursements from the bank accounts of the Defendants' Companies that appear sufficient to constitute the full wages of Unlimited employees. In addition to not seeing the payments in the banking records, your affiant has reviewed Maryland wage records for several quarters, which reported wages for very few Unlimited employees.

43.     The electronic messages about the employees' wages are also revealing in other ways. For example, your affiant located one message sent on or about December 27, 2015 that shows the large number of people that were being paid. The first names listed in this message correspond, with some spelling variations, to the first names of the 51 people from the employee list sent to **A. SHARVIT** on or about December 20, 2015 (excepting M.S., I.A., I.A.#2, and N.G.). The paycheck list also indicates whether the employee had provided customers with refunds.

44.     Your affiant believes that **O. SHARVIT** functioned as a manager who was responsible for day-to-day functions associated with the cosmetics sales businesses including



directing and managing employees. He participated in WhatsApp messages about the recruitment of foreign citizens in Israel to work for Unlimited, the assignment of employees, visa extensions, and setting the daily schedule.

45.     On or about May 12, 2015, **O. SHARVIT** wrote in a WhatsApp message in English asking co-conspirator #2 needed to confirm "that the company in Israel don't [sic] tell to the new employees that they finish their day at 8:00 pm" and to "bring me me [sic] maximum of employees bcse [sic] we are going to conquest America!!!!" Your affiant believes "the company in Israel" refers to the recruiting company used by the Defendants in Israel.

46.     **O. SHARVIT** also played a role in the termination of employees. For example, on or about December 29, 2015, **O. SHARVIT** sent a message to other Defendants and co-conspirators stating "[first name of E.S.[13]] is fired. Please prepare his paycheck of the last week, he's leaving Tomorrow morning." In December 2015, E.S. was in the United States on a B-2 visitor visa. He departed the United States on or about January 6, 2016.

47.     On or about January 4, 2016, **O. SHARVIT** sent a WhatsApp message to other Defendants and co-conspirators stating: "[First name of M.G.[14]] needs visa extension emergency, Shes burnt [sic] tomorrow!" Your affiant believes this referred to M.G. and that "burnt" meant she would be a visa overstay. This conclusion is based on context and on a check of government

---

[13]     There is a one letter variation in the first name of the employee between the message and the employee list sent on or about December 20, 2015, one uses a "y" and the other an "i."

[14]     There is a one letter variation in the first name of the employee between the message and the employee list sent on or about December 20, 2015, one uses a single "a" and the other uses two, e.g. "aa."



records which show that M.G. was granted a period of admission to the U.S. as a B-2 visitor that ended on or about January 8, 2016.

48.      On or about December 26, 2016, **O. SHARVIT** sent a WhatsApp message stating in part "[nickname of A.B.] burned in two weeks. Working til 1/1/17 . visa extension refused, [co-conspirator #3] will check again the papers with him tomorrow night. He already talked with Rona about it. I continue siha with him tomorrow. (Possible to convince him to stay and find somebody to marry)."  Your affiant believes "siha" might be a reference to meetings from the context. Your affiant believes "Rona" refers to **ZHFANI** and submits that this message demonstrates that **O. SHARVIT** knew and understood the unlawful purpose of the conspiracy, in particular, how the Defendants were using commission-based, illegal labor to operate their businesses by purposely circumventing the United States visa and immigration process.  He was even willing to go further, as demonstrated here by the seeming reference to a potential marriage fraud to allow an Unlimited employee to remain in the United States.

49.      Your affiant believes that **ZHFANI** held a similar position in the company to **O. SHARVIT**. She also functioned as a manager who was responsible for helping to set schedules, assigning employees to housing, and managing employees.

50.      On or about June 12, 2015, **ZHFANI** sent a WhatsApp message to other Defendants and co-conspirators containing a list of approximately 8 apartments and approximately 27 first names assigned to the apartments. On or about September 29, 2015, **ZHFANI** sent a WhatsApp message to other Defendants and co-conspirators containing a list of approximately 9 apartments and approximately 30 first names. On or about November 21, 2015, **ZHFANI** sent a WhatsApp message to other Defendants and co-conspirators containing a list of approximately 12 apartments and approximately 42 first names. Based on the investigation, your



affiant believes these names were employees working for Defendants' Companies and living in housing provided by the companies.

51.     On or about March 8, 2016, **ZHFANI** sent a WhatsApp message directly to co-conspirator #1. Based on your affiant's use of Google Translate the message appears to state, in part, as follows: "Tell Oren to close the girl and the guy they are not connected to that company are in another company that is afraid now after this story and decided to make all their employees legal !! They're going to be monsters here!" Your affiant submits that "Oren" refers to **O. SHARVIT** and that in this message **ZHFANI** is discussing recruiting workers for Unlimited and that her reference to "employees legal" refers to using employees who could be legally employed in the United States.

52.     On or about October 18, 2016, **ZHFANI**, other Defendants, and co-conspirators received a WhatsApp message that contained a PDF file with the airline boarding passes of three foreign citizens, S.L., E.E., and Y.G. In a response that your affiant Google translated, **ZHFANI** responded by asking if they had a phone and whether there was a photo of the employees to help locate them. U.S. government databases reveal that S.L., E.E., and Y.G. entered the U.S. on or about October 19, 2016 on B-2 visitor status. Records also show that S.L. and E.E. interviewed for their U.S. visas together and were issued B-1/B-2 visas on or about October 5, 2016.

53.     On or about October 21, 2016, **ZHFANI** sent a message to other Defendants and co-conspirators, which your affiant used Google to translate, stating that [first names of S.L. and E.E.] had been assigned rooms.

**There Is Probable Cause To Believe The Target Devices Contain Relevant Evidence**

54.     As detailed throughout this affidavit, your affiant and other federal agents have obtained evidence revealing **A. SHARVIT, O. SHARVIT** and **ZHFANI's** extensive use of

electronic devices in furtherance of the crimes under investigation, in particular, WhatsApp messages and, in the case of **A. SHARVIT**, emails[16]. The Defendants used electronic messaging to carry out their criminal activities, including to exchange business information with each other and other co-conspirators such as employee work schedules, pay amounts due to employees, and visa extension information.

55.     Your affiant submits that there is probable cause to believe that the **Target Devices** contain additional electronic evidence.[17] Based on information uncovered to date in the investigation, there is probable cause to believe that **A. SHARVIT, O. SHARIVT,** and **ZHFANI** all used smartphones and have sent WhatsApp messages about the conspiracy from 2015-2017 and that **A. SHARVIT** has sent emails about Defendants' Companies and that **ZHFANI** has posted relevant photographs to Facebook.[18]

---

[16]     Based on information obtained pursuant to an email search warrant for an account associated to **A. SHARVIT** your affiant received Internet Protocol ("IP") address information for IP addresses used to access the account. Your affiant input those IP addresses into an internet service used to lookup more details on an IP address https://www.ultratools.com/tools/ipWhoisLookupResult) and found that on or about January 29, 2018, February 6, 2018, February 7, 2018, February 11, 2018, February 14, 2018, and February 15, 2018 the email account was accessed from IP addresses that the internet search tool shows belong to AT&T Mobility LLC. Your affiant knows that as of in or about August 2017, the phone number linked **A. SHARVIT** in the WhatsApp messages was serviced by AT&T. Your affiant submits that it is likely that these IP addresses indicate that he accessed his email from a cellular device.

[17]     Based on my experience, your affiant know that WhatsApp messages are stored on the device used to send or receive the messages. Therefore, **A. SHARVIT, O. SHARVIT,** and **ZHFANI's** devices may contain copies of the incriminating messages outlined herein.

[18]     On the publicly visible portion of **ZHFANI's** Facebook page, your affiant found pictures of foreign citizens who your affiant believes based on the investigation have worked for the Defendants' Companies. Your affiant reviewed the photos on **ZHFANI's** Facebook page and

21



## STATUS OF THE TARGET DEVICES

56.     Homeland Security Investigations (HSI), Baltimore is currently maintaining

custody of the Target Devices following their initial seizure during **SHARVIT, O. SHARVIT,**

and **ZHFANI's** entry into the United States.

## TECHNICAL TERMS

57.     Based on my training and experience, your affiant uses the following technical

terms to convey the following meanings:

      a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular
telephone) is a handheld wireless device used for voice and data communication
through radio signals.  These telephones send signals through networks of
transmitter/receivers, enabling communication with other wireless telephones or
traditional "land line" telephones.  A wireless telephone usually contains a "call
log," which records the telephone number, date, and time of calls made to and
from the phone.  In addition to enabling voice communications, wireless
telephones offer a broad range of capabilities.  These capabilities include: storing
names and phone numbers in electronic "address books;" sending, receiving, and
storing text messages and e-mail; taking, sending, receiving, and storing still
photographs and moving video; storing and playing back audio files; storing
dates, appointments, and other information on personal calendars; and accessing
and downloading information from the Internet.  Wireless telephones may also

---

found one group titled "iOS Photos" and another "Mobile Uploads" which your affiant
understands refers to photos uploaded from Apple devices and mobile devices respectively.
Within those albums, your affiant located photos of a BioXage store and photos of people
standing in front of a Deja Vu kiosk.  The albums also contained many photos of **ZHFANI** and
photos of others including some photos that had been tagged to other Facebook accounts
including the accounts matching the names of S.Y., Y.E., M.G.#2, R.Z., and A.B. – all five were
named on an employee list sent to **A. SHARVIT** on or about December 20, 2015 and all five
filed visa extensions linked to the fraud scheme. Based on my knowledge and experience, your
affiant know that a photograph is often saved on a user's device before it is uploaded to
Facebook. Therefore, there is probable cause to believe that at least some Facebook photos are
likely stored on **ZHFANI's** personal electronic device(s).



include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For



example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

58.  Based on my training, experience, and research, and from consulting the manufacturer's product specifications available online at https://www.apple.com/iphone-7/specs/ and https://support.apple.com/kb/sp705?locale=en_US, your affiant knows that the Target Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

59.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

60.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a

24



file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

b. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

61. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

62. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion into a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.



## CONCLUSION

18 - 2 4 4 5 **BPG**

63.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Device described in Attachment A to seek the items described

in Attachment B.


Respectfully submitted,


_____
James J. Jenkins
Special Agent
Diplomatic Security Service
Department of State


Subscribed and sworn to before me
on September 4, 2018:


_____
BETH P. GESNER
UNITED STATES CHIEF MAGISTRATE JUDGE



18 - 2 4 4 5 **BPG**

## ATTACHMENT A

This warrant applies to all information associated with the following three cell phones, which are currently in the possession of federal law enforcement and located at HSI Baltimore, 31 Hopkins Plaza, 6th Floor, Baltimore, Maryland:

1.  An Apple iPhone 7, model A1778, International Mobile Equipment Identity ("IMEI") 353841087910253;

2.  An Apple iPhone 6, model A1549, IMEI 355791070629055; and

3.  An Apple iPhone 7 Plus, model A1784, IMEI 356572082018670.

Collectively these are referred to as the "Target Devices." This warrant authorizes the forensic examination of the Target Devices for the purpose of identifying the electronically stored information described in Attachment B.



**ATTACHMENT B**                              18 - 2 4 4 5 **BPG**

For the time period January 1, 2013 to the present, all documents, records, and information set
forth below, relating to violations of violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. §
1546 (visa fraud), 18 U.S.C. §§ 1512(k), 1519 (obstruction of justice), 8 U.S.C. § 1324
(harboring aliens), and 8 U.S.C. § 1324a (unlawful employment of aliens):

1. All electronic data, documents, records, and information regarding (a) citizens of other
   countries entering, remaining in, or leaving the United States; (b) the hours,
   compensation, duties, location, supervision, job performance, logistics, immigration
   status, recruitment of, or contracting with foreign workers; (c) the travel, transportation,
   and housing of any foreign citizen; (d) the hiring, hours, payroll, payment of, period of
   employment, firing, qualifications and background of any employee of any business with
   locations in the United States; (e) the consideration of, the preparation for, the payment
   for, or an application to extend a U.S. visa including related documents and
   correspondence; (f) information provided to or submitted to the U.S. Citizen and
   Immigration Services, U.S. Customs and Border Protection, Immigration Customs
   Enforcement, the U.S. Department of Homeland Security, or the U.S. Department of
   State; and (g) all current, former, or future employees of businesses associated in any way
   with the following individuals or entities:  Mordehay (aka Moti) FOOX, Asher
   SHARVIT (aka CHARBIT), Rona ZHFANI (aka SHARVIT), Oren SHARVIT (aka
   CHARBIT), Eyal CHERTOFF, Esti (aka Esty) MAZOR, (collectively "Defendants"),
   Unlimited Treasures, Unlimited 13, Deja Vu, BioXage, BH Distribution Group LLC,
   3505 Clarks Ln LLC, and/or Filicori Zecchini (collectively "Defendants' Companies").

2. All electronic data, documents, records, and information regarding communications and
   financial arrangements with aliens and foreign citizens, and the employment and use of
   aliens and foreign citizens.

3. All electronic data, documents, records, and information regarding the finances and
   business interests of the Defendants or the Defendants' Companies.

4. All electronic data, documents, records, and information relating to the U.S. immigration
   laws, and the submission of information to U.S. or state authorities.

5. All electronic data reflecting attempts to obstruct justice, including but not limited to the
   destruction of documents and electronic evidence, and attempts to corruptly persuade co-
   conspirators and witnesses with regard to any investigations into the Defendants' crimes.

6. All electronic data, documents, records, and information regarding financial transactions,
   assets, and the transfers of things of value, including bank statements, wire transfer
   records, loan records, credit card records, ledgers, checks or other monetary instruments,
   check registers, lines of credit, and safe deposit box keys and records.



7. Any and all electronic data, documents, records, and information constituting or relating to any personal or corporate income tax return and the supporting schedules and attachments to include but not limited to Internal Revenue Service Forms 1120, 1120s, 941, 940, 1040, 1040ez, W-2, 1099, K-1 and schedules such as Schedule C, E and related tax information

8. All data, records, and information regarding the use of the Target Devices to communicate with other individuals, including but not limited to:

   a. All telephone numbers and direct connect numbers assigned to the device, including usernames and passwords and electronic mail addresses;
   b. All call and direct connect history information;
   c. All contacts and associated telephone numbers;
   d. All stored electronic mail, including attachments; and
   e. All voice recordings, videos, text messages, messages in applications, and other messages stored on the phone.

9. All electronic data, records, and information regarding the following:

   a. Contact information, phone numbers, mailing addresses, email addresses, calendars, datebooks, domains, or other contact information for any of the individuals, addresses, or entities listed herein;

   b. Calendar information;

   c. Stored photographs, videos, and text messages;

   d. Stored documents and other files;

   e. Stored geo-location information;

   f. Data stored in any application;

   g. The times the device or a device function was used;

   h. Evidence of the attachment to the device of other storage devices or similar

   i. containers for electronic evidence;

10. All electronic data, records, and information regarding the use of the device to connect to the internet and/or connect with other cellular or computer devices, including but not limited to:
    a. All information about Internet Protocol addresses accessed by the device;
    b. All information about the Internet Protocol addresses of any entities/persons accessing the device; and
    c. All web-browsing history and any stored web pages.

11. All electronic data, showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history.

12. Any and all electronic data and information that would tend to show the identity of the person using the device.

13. Evidence of user attribution showing who used or owned the Target Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, phone numbers, saved user names and passwords, documents, browsing history, email, email contacts, "chats," instant messaging logs, photographs, and correspondence;

14. Evidence of software that would allow others to control the Target Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

15. Evidence of the lack of malicious software;

16. Evidence of the attachment to the Target Devices of other storage devices or similar containers for electronic evidence;

17. Evidence of counter forensic programs (and associated data) that are designed to eliminate data from the Target Devices;

18. Evidence of the times the Target Devices were used; and

19. Passwords, encryption keys, and other access devices that may be necessary to access the Target Devices;